**UNITED STATES of America**

v.

**Summer BLAKE, Defendant.**

**No. CR 98–979 JBW.**

United States District Court, E.D. New York.

March 15, 2000.

**330**

Mildred M. Whelan, The Legal Aid Society, Brooklyn, NY, for plaintiff.

Loretta A. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, by Thomas Firestone, Assistant United States Attorney, for defendants.

MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................331
II.  FACTS ..................................................................331
     A.  Crime .............................................................331
     B.  Guidelines ........................................................332
     C.  Defendant's Background ............................................332
     D.  Psychiatric Profile ...............................................333
     E.  Victim ............................................................334
     F.  First Sentencing Hearing ..........................................335
     G.  Victim's Reaction .................................................336
     H.  Post–Hearing Rehabilitation.......................................336
     I.  Second Sentencing Hearing .........................................337
III. CAN THE COURT DEPART? .................................................338
     A.  Diminished Capacity ...............................................338
     B.  Aberrant Act ......................................................339
     C.  Extraordinary Family Circumstances ................................339
     D.  Probabilities of Rehabilitation ...................................339
IV.  SHOULD THE COURT DEPART? .............................................340
     A.  Rehabilitation ....................................................340
         1.  What is Rehabilitation?........................................341
         2.  Growth of the Rehabilitative Model ............................341
             a.  England ...................................................342
             b.  New York ..................................................342
         3.  Decline of the Rehabilitative Model ...........................343
             a.  Modern Prison Environment .................................344
             b.  Current Role of Rehabilitation in Federal Sentencing.......345
         4.  Rehabilitation and Incarceration: Concluding Thoughts .........346
     B.  Victim Impact .....................................................347

1. Historical Uses of Victim Impact Considerations........................347
2. Role of Victim Impact in the Current Federal Regime...................349
   a. Seriousness of Offense .........................................349
   b. Respect for Law................................................350
      i. Societal Desires ...........................................350
      ii. Victim Catharsis ..........................................351
3. Restitution ....................................................351
   C. Reconciliation and Forgiveness ..................................352
V. CONCLUSION .....................................................352

## I. INTRODUCTON

The defendant tried to rob a bank. In the course of her botched attempt she stabbed a teller causing severe permanent physical and psychological injury. Having pleaded guilty, she must now be sentenced.

Sentencing is a serious and difficult task raising such issues as the role of punishment as just dessert, deterrence, rehabilitation, and victims' rights. There is no dispute that the defendant committed a dreadful crime resulting in a debilitating injury to an innocent victim. At the same time, the bizarre facts of the crime, the background of the criminal, and her behavior and rehabilitation following her arrest suggest that this case should not be mechanically decided through rigid application of the federal Sentencing Guidelines.

Three real and vulnerable people are directly affected—the victim, the defendant, and the defendant's daughter. Indirectly involved are defendant's extended family and community, the persons who were present in the bank and terrorized by the crime, and the larger public interested in deterrence of future crimes and public safety. Departure from the Guidelines is required in order to take appropriate account of the needs of all those concerned.

## II. FACTS

### A. Crime

On June 22, 1998, Summer Blake, a diminutive, comely African–American woman, was 21 years old. She parked her car near a Chase Manhattan Bank in Brooklyn. Entering a nearby building, she walked to the third floor and changed her clothes in a stairwell where she left them. Her new outfit consisted of a pink wig, white sweatshirt, painted blue jeans, and work boots.

The would-be robber attempted to hide behind a garbage dumpster from where she appeared to be looking into the bank's window. Not surprisingly, she was observed by several witnesses. At one point, she ran up the handicapped entrance to the bank and then returned to the dumpster.

Shortly thereafter, she entered the bank and yelled, "This is a stickup." She was brandishing what appeared to be a gun and ordered everyone to the front of the bank. Sheron Nauzo, an assistant manager at Chase, was seated at her desk with a customer when Blake approached her with the gun-like object and a knife. After Ms. Nauzo assumed a position on the floor, the defendant ordered her to unlock the vault. When she fumbled for her keys, a coworker unlocked the vault, entered it, and attempted to close the door behind her, leaving Ms. Nauzo and Blake on the other side.

At this point, Blake became agitated and struck at Ms. Nauzo with a knife. Ms. Nauzo was stabbed in the left hand as she attempted to ward off the blow, suffering permanent tendon and nerve damage.

The defendant proceeded behind the teller counter and yelled, "Where's the money?" She then grabbed several rolls of coins and ran from the bank. Witnesses observed her leaving the bank and running in the direction of the building where she had secreted her clothing. They also saw coins falling out of a bag she was carrying.

Members of the civilian Williamsburg Safety Patrol followed Blake to the building and kept it under surveillance until officers from the New York City Police Department arrived. She was located by police in the basement and arrested. When she was discovered, she had stripped down to her underwear. Her clothes and the knife were recovered under the stairwell. The police also recovered the "gun" she had used, which was a toy. No money was recovered from Blake, but $29.75 in coins was found in a lot adjacent to the building.

In a post-arrest statement, Blake admitted her role in the robbery. She stated that she committed it by herself and that no one was aware of her intentions.

Defendant was charged with the crimes of bank robbery (18 U.S.C. § 2113(a)) and assaulting a person or putting his or her life in jeopardy during the commission of the robbery (18 U.S.C. § 2113(d)). She pleaded guilty to both crimes.

### B. Guidelines

Blake does not challenge the Sentencing Guidelines calculation of a total offense level of 29 and a criminal history category of I, calculated as follows: The base offense level for the robbery is 20. *See* U.S.S.G. § 2B3.1(b)(1). She received enhancements of two points because property of a financial institution was taken (§ 2B3.1(b)(1)), of four points because a dangerous weapon was used (§ 2B3.1(b)(2)(D)), and of six points because Ms. Nauzo suffered permanent bodily injury (§ 2B3.1(b)(3)(C)). Her offense level was reduced by three points because of her acceptance of responsibility (§ 3E1.1(a), (b)). These computations resulted in a total offense level of 29. Based upon a criminal history category of I (no prior offenses), the Guideline's sentencing range is no less than 87 months and no more than 108 months. She would receive credit of approximately one month for the period she was incarcerated awaiting release on bail and in custody for a psychiatric examination at a government institution.

### C. Defendant's Background

In determining a sentence, it is worth attempting to understand (as best one can) what set a defendant upon her illegal course. While it does not excuse her conduct, Blake's difficult background and misplaced—even sick—reliance on men critical to her life provide a useful context.

Defendant was born in 1977 to the consensual union of Dennis James Corley and Carrie Lee Blake in Brooklyn, New York. The parents lived together until Blake was four; since then they have remained friends. The mother has allowed Blake's father to reside at her home when he needed a place to stay. At times Blake maintained some relationship with her father, but she went through extended periods of rare or no contact.

Both parents have a history of drug abuse. Her father apparently still uses narcotics. Beginning at the age of four, Blake would find her mother's drug paraphernalia around the house. When the defendant was five, her mother began a romantic relationship with a woman who also abused drugs. This relationship ended in 1998; Blake's mother and her former companion remain friends.

Blake's mother always held a job and financially supported the defendant. Since her mother stopped taking drugs in 1992, she has tried to guide defendant. She encouraged the defendant to pursue acting and modeling careers. Her mother, father, other relatives, friends, and a member of the cloth have supported defendant by attending her various appearances in court and in encouraging her rehabilitation attempts.

In October of 1996, when defendant was nineteen, she gave birth to a daughter. Blake's relationship with her child's father ended when she was four months pregnant. At that time, defendant contends that he tried to rape her. He physically

assaulted defendant's mother who obtained a restraining order. Blake believes that her former lover is currently institutionalized for mental health reasons although she does not know where he is.

Blake's daughter—a pretty and vivacious three year old—lives with defendant and her mother. She is financially supported by them and appears to be a well cared for, intelligent, and happy child.

In April 1997, Blake began a relationship with one Richard Williams that led directly to the crime in question. In August 1997, the defendant began cohabitating with Williams. Physical violence against, and domination of, defendant was endemic. During this period, the defendant lost focus in school and eventually withdrew. After returning once, she quit again.

Prior to her arrest, she had completed one semester at Long Island University where she studied accounting. Her paramour complained that Blake's studies were preventing her from spending sufficient time with him. They fought daily. He continued to beat her.

Even though Blake paid the rent for their apartment, only Williams' name was on the lease. When the defendant threatened to call the police to complain of physical abuse, he told her that she would be thrown out of their abode.

By December 1997 Blake had exhausted her savings and was wholly dependent upon her mother for financial support. In January 1998 defendant's uncle moved into the apartment and ordered Williams to leave. Williams continued to call, telling Blake that he missed her. They resumed the relationship. Eventually the uncle moved out of the apartment.

In March 1998 Blake returned with her daughter to her mother's home. She continued, however, to see Williams; his abuse continued. Williams' financial reliance on Blake also grew. He insisted that she give him $1,800 to obtain his motorcycle which had remained in a repair shop for a year.

In June 1998 Blake, in an attempt to escape from Williams, slept in a neighborhood park. Williams later found defendant at a hotel. He ranted that it was her fault that his motorcycle remained in the shop.

The robbery occurred two days after Williams' renewed importuning. The crime's goal was to obtain money to pay for the motorcycle. Even after her arrest, Blake continued to speak with Williams. She maintained contact with him until December 1998.

### D. Psychiatric Profile

Shortly after her arrest, Blake was released on bond. As part of the bail conditions, she was placed on home detention and was required to receive a psychiatric evaluation.

Early indications of Blake's psychiatric problems predate the incident. Blake contends that she had previously experienced symptoms of anxiety and depression following a 1997 automobile accident when she was a passenger in a car driven by Williams. She was treated by a psychologist who found her to be "seriously depressed" and recommended psychotherapy. After three visits she terminated treatment.

There were two suicide attempts. One was at age 12 or 13. The other occurred after her arrest when she tried to choke herself with her handcuffs.

Following her release from jail, Blake was interviewed three times by Dr. Alexandra Bardey, a psychiatrist, in July 1998. Her conclusions were that at the time she committed the crime, Blake suffered from major depression and mixed personality traits with borderline and dependent features. The latter condition is "characterized by fear of abandonment, chaotic relationships, and feelings of emotional emptiness, especially when unattached." As part of this condition, the

doctor found that Blake tends to rely on others and is passive and submissive. Moreover, she will go, the doctor opined, to great lengths to maintain a dependent relationship. These traits have, the doctor found, made her prone to being abused.

Blake was also examined in July 1998 by Dr. N.G. Berrill, a psychiatrist, of the New York Center for Neuropsychology and Forensic Behavior Science. His conclusions mirror those of Dr. Bardey. He found that Blake suffers from major depression and personality disorder with borderline features. His recommendation was that Blake be treated on an individual basis as well as in group therapy.

Blake followed Dr. Berrill's advise. She has been in counseling for more than a year and a half. She has attended all of her individual sessions and is an active participant in group therapy.

In addition, defendant has received intense spiritual guidance from Reverend Cheryl G. Anthony of the Judah International Christian Center. Reverend Anthony is one of the many individuals who wrote or appeared in this court on behalf of the defendant.

Before proceeding to sentence, the court ordered defendant to undergo another mental health evaluation. In June 1999 she was sent to the Federal Medical Center (FMC) in Carswell, Texas. The conclusions of the FMC were in line with the earlier analyses. Its report noted that Blake "appears to have been experiencing a significant depressive episode prior to, and at the time of, her arrest." It diagnosed a dependent personality disorder. The report concluded that defendant was suffering from a mental illness at the time of the instant offense that "prohibit[ed] Ms. Blake from understanding the nature and wrongfulness of her crime."

The court disagreed with the suggestion that defendant might have been not guilty by reason of insanity. Based on an allocution before the magistrate judge as well as its own observations and evaluations of the record and without objection by counsel, the court accepted defendant's plea of guilty.

E. Victim

Sharon Nauzo, the victim of this crime, suffered serious and permanent damage to her hand caused by Blake's knife. In March 1999, she submitted a powerful victim impact statement recounting the incident and her subsequent medical problems. The letter is worth quoting at length.

Ms. Nauzo first described the incident as follows:

> My staff and I complied with all [Blake's] shouted commands, but apparently we were not taking her to the money fast enough—and that is when she attacked me with the knife twice. She was aiming for my chest—**in the region of my heart**—but, thank God, I had the presence of mind to protect my life, so, instead, my left hand was stabbed twice. In fact, she coldly said that she would keep stabbing me until the "f_____g door was open."

(emphasis in original). She went on to explain her physical and mental injuries:

> Ms. Blake did severe damage to my left hand, as a result of which I have not been able to return back to work as yet. I had to have a five-hour operation to repair the damage she did to the nerves and tendons in my hand. It's now nine months later, and the feeling still has not fully returned to my thumb, index and middle finger. Neither can I bend the index or thumb fingers fully. The web space between the index and the thumb has shrunken considerably, making it very difficult for me to pick up things, and I have to look forward to the prospect of another operation to correct these problems.
>
> ... I am forced to wear a splint 24 hours a day.... I had to learn to use my left hand all over again, and I still have lots of difficulty lifting weights,

holding and picking up objects, combing my hair, washing my back, using a computer—just to name a few things. . . .

As bad as the physical damage was—the psychological traumas that I suffered and am still suffering were far worse. For the first week after the incident I could not eat nor sleep properly. I kept having panic and anxiety attacks when I closed my eyes. I had nightmares, flashbacks—the works. I have had to seek psychological counseling to deal with the trauma of the attack and am presently still being treated for post-traumatic stress disorder.

My sense of self in the world, as well as a healthy sense of safety in the world, has been drastically altered. I have lost my faith and trust in strangers and my innocence. Sometimes I have difficulty concentrating and experience lots of anger and frustration—hence my inability to return to the world of branch banking. . . . [T]his was a job I did and loved for 16 years with no problems.

At the end of her letter, Ms. Nauzo made a stiff sentencing recommendation:

I am requesting that Ms. Summer Blake be sentenced to the maximum penalty available under the law for the crime that she has committed. Her action not only affected me; it also affected my husband, my mother, my father, my family and my friends. The staff members who witnessed the attack were also traumatized by it.

Please take into consideration the fact that my left hand is permanently damaged as a direct result of her actions and that psychologically I will never be the same, or view people in the world the same way anymore. I have suffered greatly as a result of her actions: emotionally, physically, mentally, and financially; and I am still suffering with no end in sight. I sincerely hope that the punishment will fit the crime.

A second letter, discussed below, was sent by Ms. Nauzo after the first sentencing hearing. *See infra* Section II.G.

### F. First Sentencing Hearing

Blake moved for a downward departure from the Guideline's imprisonment range of 87 to 108 months. She argued that: (i) she suffered from a significantly diminished capacity at the time of the offense (U.S.S.G. § 5K2.13), (ii) the offense was an aberrant act (*id.* at ch. 1, pt. A, 4(d)), and (iii) her daughter would suffer great emotional trauma if defendant were incarcerated (*United States v. Galante*, 111 F.3d 1029 (2d Cir.1997)). Blake also argued that when these grounds for departure were examined together, they indicated that the case fell significantly outside the Guidelines' heartland.

In September 1999 the court held its first sentencing hearing. After accepting her guilty plea and going through its sentencing checklist, the court asked Blake to summarize the victim's statement. Blake responded, "She requests that I receive the maximum sentence for the injuries I've caused her. The injuries were—she suffered—I injured her hand and she's suffering now. She had surgery and she don't know if she'll be crippled for life." The court proceeded to remind Blake of numerous other details of the letter beyond the request for the maximum penalty, such as the way she stabbed Ms. Nauzo, the operation the victim went through, the extent of the injuries, and the psychological trauma Ms. Nauzo and others continue to suffer. While Blake was conceding these points, she began to sob uncontrollably.

At the hearing, numerous individuals appeared in support of Blake's request for a downward departure. Among her family members were her daughter, mother, father, aunt, and uncle. In addition, Reverend Cheryl Anthony, her adviser and a friend of the family, and her mother's former companion were present.

At the hearing, Blake's lawyer described how Blake has tried to make amends for what she did and discussed her psychotherapy, community service with her

church, return to work, and enrollment at Pace University. The attorney also emphasized Blake's personal history and the absurd modus operandi of the crime. Counsel further claimed that even though her client answered the court's question about Ms. Nauzo's letter by focusing on the sentencing recommendation, Blake had "every word of that letter memorized" and was deeply remorseful.

Defense counsel also stated that Blake wished to make financial restitution for any of Ms. Nauzo's uncovered expenses. This was an offer that Ms. Nauzo, according to the Assistant United States Attorney, refused.

Following counsel's statement, Reverend Anthony spoke about Blake's involvement with her church and the counseling sessions that the two have engaged in. Blake's mother made a plea for mercy. Finally, Blake herself addressed the court, apologizing for what she had done, discussing the suffering she has caused Ms. Nauzo, and relating the benefits she has received from counseling.

The government declined to take a position on the downward departure motion. It stated that "the facts of this case are so complex as to be the type of case that really should be left to the discretion of your Honor." It conceded that Blake was suffering from a major depressive episode at the time of the incident and that she has a major personality disorder.

Due to the difficulty of the issues involved, the court decided to reflect upon this troubling case and not sentence Blake immediately. It ordered a copy of the minutes of the sentencing hearing to be sent to Ms. Nauzo so she could have the opportunity to respond. The sentencing date was set in March 2000, six months away, to permit a possible demonstration of further rehabilitation and contrition.

### G. Victim's Reaction

After reviewing a transcript of the hearing, Ms. Nauzo, the victim, wrote the court another letter in September 1999. While she acknowledged the difficulties and psychological problems that have plagued the defendant, she pointed out—quite correctly—that the court should "not forget that there is a victim here—and the victim is not Ms. Summer Blake—it is I. It was my life that was threatened—my hand that was injured beyond repair." She also reminded the court of her inability to work or return to school since the incident. She pointed out that "[t]here is also a real fear that she can hurt someone else, and disrupt their life the way she did mine, and just blame it on her mental condition."

Her conclusion, however, is much more equivocal than that in her earlier letter. She had originally requested that Blake receive the maximum sentence. In this second letter, while stating that while she is unsure whether a sentence of time served with five years of supervised release "will demonstrate to her the gravity of what she did," she concludes that "given the mitigating circumstances of her mental condition, I will concur with [the government]," *i.e.*, that it is best to leave the case to the discretion of the court.

### H. Post–Hearing Rehabilitation

Between the first sentencing hearing in September 1999 and the sentencing in March, Blake continued with her education, employment, and therapy. She enrolled at Pace University where she satisfactorily completed her first semester. She is currently attending classes three nights a week.

Defendant has also maintained fairly steady employment. At the time of the initial sentencing hearing, she was working for a contracting company. Over time, however, she found that conditions in the office became, as her counsel put it, "unprofessional." Defendant felt that she was not treated well by coworkers and that other behavior in the office was disturbing. Blake also feared that she was slipping back into a depressive state. After talking with her therapist, Dr. Aponte, she decid-

ed to leave the job and seek other employment, which she subsequently found. She is currently employed full time at a substantial company as a receptionist at their office in Long Island City.

Throughout this period, Blake has been in counseling with Dr. Aponte. While they have recently been meeting only on a bi-weekly basis, he is trying to find time in his schedule to resume weekly meetings. Blake found Dr. Aponte's assistance during her job difficulties extremely valuable. Dr. Aponte, in turn, declares that Blake's response to her employment problems laudable because she directly confronted and dealt with the issue of abuse.

Blake also sent a letter to the court dated March 2, 2000, expanding on her contrition and feelings of remorse about what she had done to her victim, Ms. Nauzo. The letter reads as follows:

I am writing to convey my sincerest apologies to Ms. Sheron Nauzo, the other victims of this horrible crime I committed, the institution, the people of that community, but especially Ms. Nauzo. I know and realize that I caused people lives to be changed for the worst on the day of June 22, 1998. I am sincerely sorry and even grieved that I did that awful and even frightful act to the workers of Chase Bank. I have a contrite heart because of the hurt I caused and psychical damaged I did to Ms. Nauzo. I know that the victims are suffering psychologically and even physically in Ms. Nauzo's circumstance. I pray every night for the victims of the bank robbery and their families because it was a day of tragedy for them. Ms. Sharon Nauzo has a right to be angry with me because she did not do anything to deserve what I did to her and I had no right to inflict this pain on her. Thank God, her life was not taken because of my malicious actions. I know that she had operations to repair the damages to her hand and she was suppose to have another operation and I hope it went well. I am so sorry that Ms. Nauzo has to go through this. It is torture and I cannot say sorry enough. I hope that she has feeling in her thumb and two fingers that are injured, now. I hope that with this last operation she does not have to wear a splint. I was thinking about her day to day coping and since she has difficulty using her hand to comb and wash her hair, pick up objects, or even use a computer, I wish I could be of service to her. I want to pay all the possible restitution that is necessary for her injuries. I know that it would not make everything right or heal her injuries like her hand, mind, and heart but I feel a need to pay back something I had no right to take away. I hope that she is now able to eat and sleep now normally. I also pray that she does not have anymore panic and anxiety attacks with the help of her psychological counseling.

I took away a lot of valuables from Ms. Nauzo like her job she can't return to work because of me; and her faith because she doesn't understand why I would do this malicious act to her; and her trust which she needs in order to be in public alone and unafraid. What I did will damage people lives permanently because I cannot erase it from their memory. It is there past, present, and future and I am sincerely sorry for that. I will never forget what I have done and I will never take it lightly. I am hoping that one day Ms. Sheron Nauzo and the other victims of the bank robbery will have as much healing as possible. I will never allow myself to hurt another human being again. I will continuing seeking psychological therapy with Dr. Aponte and contribute to my community through JUDAH International Christian Center until the Court say otherwise. I plead for your mercy in this sentencing and accept whatever sentence you impose.

I. Second Sentencing Hearing

At the March 2000 sentencing Blake again spoke about her actions. She apolo-

gized for her statement in the earlier hearing, which she described as selfish, that focused on Ms. Nauzo's desire that the maximum sentence be imposed. Blake's parents and aunt also spoke on her behalf. Defendant's daughter was in attendance.

The government again agreed that the sentence should be left to the discretion of the court but reminded it of the serious harm Ms. Nauzo suffered. Prior to imposing sentence, the court ordered that Blake's most recent letter and a picture of her daughter be sent to the victim.

## III. CAN THE COURT DEPART?

As already noted in Part II.F, Blake has sought a downward departure upon three grounds: (i) significantly diminished capacity at the time of the offense (ii) the offense was an aberrant act, and (iii) Blake's daughter would suffer great emotional trauma if her mother were incarcerated. In addition, the court believes that Blake's significant rehabilitation since her arrest presents another ground for departure. *See United States v. Core,* 125 F.3d 74, 74–75 (2d Cir.1997). The court has the power to depart based upon all these grounds individually and together.

### A. Diminished Capacity

■ Guidelines section 5K2.13 allows for departures "if the defendant committed the offense while suffering from a significantly reduced mental capacity." It lists three situations in which a departure on this ground is unavailable:

(1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.

*Id.* Blake does not fall within any of these exceptions.

While it is clear that the first exception is not relevant, Blake's crime did involve violence, raising the possibility that the latter two exceptions could apply if the court believed the public was at risk. Based on the facts and circumstances surrounding the crime and Blake's post-arrest behavior, Blake's incapacitation is not necessary to protect the public. Accordingly, the court may consider whether it can depart on this basis.

Under the Guidelines, significantly reduced mental capacity "means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong." *Id.* app. note 1.

When Blake committed the crime, her power to reason was significantly impaired. Three psychiatrists have agreed that she suffered from depression and a personality disorder with borderline and dependent features. In addition, the Federal Medical Center concluded that at the time of the crimes, these disorders "prohibit[ed] Ms. Blake from understanding the nature and wrongfulness of her crime." Her mental disorders demonstrate that she falls within category (B) of the Guideline's definition of significantly reduced mental capacity.

In addition, Blake's ability to reason was greatly harmed by the abuse she suffered from different men in her life. Whether this fact alone would permit a departure is uncertain. *Cf. United States v. Rivera,* 192 F.3d 81, 85 (2d Cir.1999) ("[I]n extraordinary circumstances ..., district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense."). Abuse by men did contribute to a significantly diminished capacity in Blake. In fact, a direct link exists between Williams'

demand for money to pay for his motorcycle repairs and the robbery.

A departure pursuant to section 5K2.13 is authorized.

### B. Aberrant Act

■ Departure is also permitted on the ground that the crime was a single act of aberrant behavior. *See* U.S.S.G. ch. 1, pt. A, 4(d); *United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir.1991). The Second Circuit has adopted a "totality of circumstances" test to determine whether a defendant's conduct constitutes aberrant behavior. *See Zecevic v. United States Parole Comm'n*, 163 F.3d 731 (2d Cir.1998). In employing this test, a court may examine factors such as:

> (1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant, including any psychological disorders from which he may have been suffering, at the time of the offense; (5) the defendant's motivations for committing the crime, including any pecuniary gain he derived therefrom; and (6) his efforts to mitigate the effects of the crime.

*Id.* at 736.

■ Blake's crime was aberrant, under the relevant standard. She satisfies virtually all of the enumerated factors. The robbery was her first offense. The most minimal planning was involved in its commission. This planning was not for the purpose of fomenting the "perfect crime." Blake's actions—for example, her "disguise" and loitering in the area around the bank—indicate that she was devoid of any rational desire to escape. In addition, she was suffering from a significant psychological disorder at the time of the offense and was under intense pressure from an abusive boyfriend. *See supra* Section III.A.

It is not entirely clear what motivated Blake to act in a way so different from her normal peaceable behavior. While, in some simplified sense, she seemed to be seeking money to help her boyfriend, the explanation is probably much more opaque. That the robbery netted her a temporary total of $29.75 leads to the question whether the motive was really pecuniary.

Power to depart due to the aberrant nature of Blake's act does exist.

### C. Extraordinary Family Circumstances

■ A departure is also allowed based upon extraordinary family circumstances. *See United States v. Galante*, 111 F.3d 1029 (2d Cir.1997); *United States v. Johnson*, 964 F.2d 124 (2d Cir.1992). The Guidelines themselves generally discourage departure based upon family ties and responsibilities. *See* U.S.S.G. § 5H1.10 policy statement. Where "the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present," departure is authorized. *Koon v. United States*, 518 U.S. 81, 97, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

■ The emotional trauma Blake's child would suffer constitutes grounds for a departure on this basis. Blake is a single parent with a three year old child. This child would obviously suffer if her mother were incarcerated. While it may be doubted that this factor in isolation would provide a ground for departure, it is sufficient when weighed with the other bases for departure.

### D. Probabilities of Rehabilitation

■ Power to depart may be based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior. *See United States v. Core*, 125 F.3d 74, 74–75 (2d Cir.1997); *United States v. Williams*, 65 F.3d 301, 306 (2d Cir.1995) (affirming facilitation of rehabilitation as basis for downward departure). Since her arrest,

Blake has attended Pace University, had a full time job, and attended regular sessions with her therapist. In all of these areas she has shown marked progress. She has taken steps to treat her illness while attempting to become a contributing member of her community. There is little doubt that if Blake continues along this path, she can and will be a peaceful and productive member of society.

■ As already noted, the court intentionally delayed the sentencing of Blake for six months in order to provide a practical test of rehabilitation. The appropriateness of this practice is discussed in detail in *United States v. Flowers,* 983 F.Supp. 159 (E.D.N.Y.1997). As that decision made clear, adjournment of sentencings in order to enable defendants to rehabilitate or to prove rehabilitation is consistent with the Guidelines and Federal Rules of Criminal Procedure 32 and 35.

This practice of delaying sentence has been extremely helpful in determining defendant's rehabilitation. Because Blake's past and probability of future rehabilitation play a critical role in the departure analysis, the importance of these issues in sentencing are discussed in greater detail below. *See infra* Section IV.A.

## IV. SHOULD THE COURT DEPART?

Although the court has the power to depart downwardly, it is neither required to do so nor is it limited in any precise way as to how far it can depart. This case, more than many others, raises difficult questions about whether a departure is warranted. It is quite clear that Blake's crime was not only aberrant but also committed when she was suffering from a psychological disorder and placed in an extremely difficult situation. Moreover, since the crime was committed, Blake has attempted to rehabilitate herself and make amends for her crime.

All of these positive factors must, however, be balanced against the heavy burden posed by the fact that a woman was seriously injured by Blake. Even though the defendant appears not to be a threat in the future and should be able to lead a productive life, the consequences of her action must play a role in the court's decision. Moreover, Ms. Nauzo's desires about what sentence should be imposed must be considered even if they are not ultimately controlling.

In determining whether a departure is warranted, the court has examined several issues. *Cf.* Model Penal Code § 7.01 (listing criteria such as risk to the public, harm caused by crime, prior criminal behavior, likelihood of committing another crime, and hardship to others in determining whether to imprison a defendant); Herbert Wechsler & Jerome Michael, *A Rationale on the Law of Homicide II,* 37 Colum.L.Rev. 1261, 1300–24 (1937) (discussing factors such as the risks of defendant's actions, the defendant's character, and cause of behavior in determining severity of punishment in homicide cases). First, since Blake has already shown significant rehabilitation and treatment, what role could and would prison play in reinforcing or disrupting this positive trend? Second, what impact should Ms. Nauzo's desires have on the sentencing decision? Finally, how best can some reconciliation or closure be achieved after these awful events? To answer these questions some general background of sentencing philosophy is required.

### A. Rehabilitation

Taking into account a defendant's rehabilitation and how to further rehabilitate him or her is consistent both with the historical focus that the criminal justice system has placed upon rehabilitation and our modern federal law governing sentencing.

For much of American history one of the central rationales for punishment—along with deterrence and incapacitation—has been rehabilitation of the defendant. *See, e.g., Williams v. New York,* 337 U.S. 241, 247–248, 69 S.Ct. 1079, 93 L.Ed. 1337

(1949) ("Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence"); Arthur W Campbell, *Law of Sentencing* § 2:4, at 29 (2d ed. 1991) ("[R]ehabilitation continued as the country's dominant sentencing rationale until the late 1970's."); Robert O. Dawson, *Sentencing: The Decisions as to Type, Length, and Conditions of Sentence* 3 (1969) ("One of the major goals of the correctional process is the rehabilitation of the convicted offender."); *see also* 18 U.S.C. § 3553(a)(2) (stating that punishment should serve, *inter alia*, "educational ... goals"); Lawrence M. Friedman, *Crime and Punishment in American History* 63–82 (1993). Yet both what is meant by rehabilitation, how and where rehabilitation is best accomplished, and the relative importance of this theory to sentencing decisions has varied over time.

### 1. What is Rehabilitation?

At its most basic level, rehabilitation theory assumes that the behavior of criminals is mutable and that they can learn to conform to social norms. A crime was committed due to some ethical or moral defect that can be repaired enabling the criminal to return to his or her "normal" behavior. *See, e.g.,* Black's Law Dictionary 1287 (6th ed.1990) (defining rehabilitation as "[r]estoration of individual to his greatest potential; whether physically, mentally, socially, or vocationally"); *The Compact Edition of the Oxford English Dictionary* 2474 (1971) (defining rehabilitate as "[t]o restore to a previous condition; to set again in proper condition"). It posits that certain forms of "punishment" either in the form of imprisonment or, as has more recently been the case, alternative sentences are useful in bringing about a positive result. *See, e.g.,* Jeremy Bentham, *The Theory of Legislation* 338–39 (C.K. Ogden ed.1931).

Rehabilitation has often been described in terms of a moral transformation of the criminal through instruction in an ethical system. *See, e.g.,* Markus Dirk Dubber, *The Right to be Punished: Autonomy and Its Demise in Modern Penal Thought,* 16 Law & Hist.Rev. 113, 143 (1998). Attempts to instruct a criminal in a trade or livelihood are subsumed. On a more mundane or cruder level, a criminal may be frightened into going straight. *See, e.g.,* George Fisher, *The Birth of the Prison Retold,* 104 Yale L.J. 1235, 1279 (1995); Francis X. Clines, *Maryland is Latest of States to Rethink Youth 'Boot Camps',* N.Y. Times, Dec. 19, 1999, at 1 (discussing rise and decline in use of boot camps by states). A "cure" for some ethical imperfection in the criminal is sought through education, of a moral and practical nature, or fear.

Many of those that support the rehabilitative purpose of criminal law do not contend that this should be the sole rationale for punishment. Simply because punishment is designed to rehabilitate does not mean that it ignores whether an offender is deserving of the punishment in the first place. *Cf.* Michael Moore, *Law and Psychiatry* 235 (1984) (criticizing view that rehabilitation should be purpose of punishment). Instead, the rehabilitative model takes those that are in some sense already deserving of punishment as a just dessert for their crime and seeks to reform them.

### 2. Growth of the Rehabilitative Model

Prior to the late seventeenth century, punishment in the Anglo–American system served primarily to deter crime and to incapacitate criminals. As to the former, the criminal law relied heavily on the threat of execution and branding. In England during this period incapacitation worked not through incarceration but via banishment, first to the American Colonies and later to Australia. *See, e.g.,* Fisher, *supra,* at 1272.

In 1764 an Italian nobleman, Cesare Beccaria, published *An Essay on Crimes and Punishments,* a work that was published in English three years later. *See id.* at 1278. In it, he described most forms of punishment as inhumane and major

causes of crime. Beccaria's argument was not so much in favor of the rehabilitative model as against the harsh and random application of the existing penal system. *See* Caesar Bonesana, Marquis Beccaria, *An Essay on Crime and Punishments* 93 (photo. reprint 1953) (Philadelphia, Philip H. Nicklin 1819) (1767) ("Crimes are more effectively prevented by the certainty than the severity of punishment."). This work would affect policy to the present day.

### a. England

Beccaria greatly influenced the Englishman John Howard, who became an opponent of capital and corporal punishment. He developed a new model for prisons which was to serve as the locus of rehabilitation.

Prior to Howard, prisons were used not for punishment but "mainly to confine debtors, persons awaiting trial, and convicts awaiting execution or transportation." Fisher, *supra*, at 1239. Prisoners received no instruction of any type, and places of incarceration were vile. *See* Wayne J. Sheehan, *The London Prison System, 1666–1795,* at 1–96, 314–17 (1975) (unpublished Ph. D. dissertation, University of Maryland), *cited in* Fisher, *supra*, at 1239 nn. 18–20.

Howard rebelled against this regime, arguing that "to reform prisoners or to make them better as to their morals, should always be the leading view in any house of correction." John Howard, *The State of the Prisons in England and Wales* 40 (Warrington, William Eyres, 3d ed. 1784) (1777). He recommended a regimen of solitary reflection, piety, and labor. *See id.* at 22, 38, 40; *see also* Fisher, *supra*, at 1236, 1271–72. Since prison was to be an instrument of rehabilitation, longer sentences (although still extremely short relative to today) were recommended to improve the impact of this form of corrective. *See* Fisher, *supra* at 1271–72, 1275.

In the wake of Howard's crusade, Britain experienced an explosion in prison construction, with at least 45 prisons being built in the two decades after 1777. *See* Fisher, *supra*, at 1237. A "leading Object" of the reform was "to make Prisoners better Men." Samuel Clowes Jr. & Thomas Butterworth Bayley, *The Report ... of the State of the House of Correction at Manchester ... Presented to the Court of Quarter Sessions* 3 (Manchester, J. Harrop 1783), *quoted in* Fisher, *supra*, at 1271.

As Professor Fisher cogently argues, the penal changes of this era focused on a group seen as particular susceptible to rehabilitation—the young. *See id.* at 1238. In these new prisons, the inmates had clean facilities with individual cells. They studied the Bible and were taught productive trades. *See id.* at 1239, 1260–63. This belief that the young are the most susceptible to rehabilitation is particularly relevant when sentencing an individual such as Blake, who is now only 22.

### b. New York City

The newly independent American colonies were influenced by this rehabilitative trend. A movement away from punishment purely for retribution or deterrence began around the time of the American Revolution. *See, e.g.,* Kai T. Erikson, *Wayward Puritans: A Study in the Sociology of Deviance* 199 (1966); *see also* Harry Elmer Barner and Negley K. Teeters, *New Horizons in Criminology* 412 (1943) (quoting Dr. Benjamin Rush). While numerous changes in penology occurred in the following half century, all these shifts included some attempt to rehabilitate prisoners.

Beccaria's most important disciple in New York was probably Thomas Eddy. *See* Edwin G. Burrows & Mike Wallace, *Gotham: A History of New York City to 1898* at 366 (1999). At the end of the eighteenth century, New York had an extremely long list of capital crimes including housebreaking and malicious mischief; lesser criminals were subject to corporal

punishment or—if granted by a magistrate—confinement at hard labor. *See id.*

In the mid–1790s, Eddy proposed limitations on numerous harsh laws. He and others believed that these overly-severe laws could only be kept in check through the granting of numerous pardons. Reform efforts resulted in the 1796 abolition of corporal punishment and the reduction of capital offenses to treason, murder, and theft from church. *See id.*

Eddy was appointed warden of the Newgate Prison in Greenwich Village when it opened in 1797. Believing that a more humane prison would reduce crime while promoting public virtue, he arranged religious instruction for the inmates while subjecting them to strict discipline. Those that responded in what he conceived to be a satisfactory manner were given special privileges; those that did not were placed in solitary confinement. *See id.* at 366–67.

Eddy's effort did not result in unalloyed success. Inmates refused to work together, and riots were frequent, eventually forcing Eddy's resignation in 1804. *See id.* at 367. Yet, although his efforts met with failure, it represents an early attempt to make rehabilitation a focal point of the treatment of criminals.

By the 1820s a new penitentiary existed as part of Bellevue. It housed criminals as well as the poor. Those convicted of minor crimes faced up to three years of hard labor; those convicted of vagrancy, *i.e.*, those unemployed, poor, and on the streets, faced up to six months of hard labor. *See id.* at 503–04. While the use of hard labor served multiple penological functions and provided a cheap source of labor, it also was intended to assist prisoners in becoming functioning members of society.

More serious offenders were forced to work in a more severe atmosphere. In 1828 Newgate was closed, and its prisoners were transferred to Sing Sing in Ossining. The model used at Sing Sing was adapted from that employed at Auburn in upstate New York. Prisoners would engage in gang labor by day under conditions of absolute silence and were placed in isolation at night. *See id.* at 506. The severe punishments meted out for even the slightest infraction enabled only 30 guards to supervise 900 prisoners. *See id.* This approach made Sing Sing a source of productive labor and gave it an "awesome reputation." *Id.; see also* Gustave de Beaumont & Alexis de Tocqueville, *On the Penitentiary System in the United States and Its Application to France* (1833); *see also* Friedman, *supra*, at 79–80.

While the New York approach was only one of several models employed in the New World in this period, all of these reforms sought to employ prisons as instruments of rehabilitation and reform. Different attempts may have met with varying degrees of success, but the goal remained constant throughout the period. Although the means were frequently modified, prison reform in this period introduced the goal of rehabilitation to New York and the new American nation as a whole.

### 3. Decline of the Rehabilitative Model

Doubts about the efficacy of rehabilitation have been longstanding. *See, e.g.,* Morris R. Cohen, *Moral Aspects of the Criminal Law,* 49 Yale L.J. 987, 1012–14 (1940). Over the past several decades, the pendulum has swung strongly against the rehabilitative model. *See* F.A. Allen, *The Decline of the Rehabilitative Ideal—Penal Policy and Social Policy* (1981). This attack castigated both the usefulness of prisons as instruments of rehabilitation as well as the propriety of this model in general.

One factor that led to this reaction was a high recidivism rate. Studies in the mid–1970s, such as that by Robert Martinson, seemed to indicate the inability of prison to reform criminals. *See, e.g.,* Robert Martinson, *What Works?—Questions and Answers About Prison Reform,* 36 Pub. Interest 22, 25 (1974) ("With few and isolated exceptions, the rehabilitative efforts

that have been reported so far have no appreciable effect on recidivism."). Later studies, however, including one by Martinson, reached a different conclusion—that certain programs can be effective in reducing recidivism for certain types of offenders. *See, e.g.,* Robert Martinson, *New Findings, New Views: A Note of Caution Regarding Sentencings Reform,* 7 Hofstra L.Rev. 243 (1979); Michael Vitiello, *Reconsidering Rehabilitation,* 65 Tulane L.Rev. 1011, 1037 (1991). As opposed to the early efforts of Howard and Eddy that attempted rehabilitation within prison, these studies also examined newer rehabilitative programs consisting of alternative sentences that did not require incarceration.

Public and political opinion were shaped by sentiments castigating the rehabilitative model. A perceived large crime wave and fear of criminals enhanced this revulsion towards any form of leniency. This shift occurred simultaneously with a change in modern prison conditions and new laws limiting the role prisoner rehabilitation could play in sentencing decisions.

In addition, this trend against rehabilitation has seen an inversion of the primary focus of Howard. Whereas Howard's reform efforts in England focused on the young, i.e., those seen as most susceptible to rehabilitation, *see supra* Subpart IV. A.2.a, today more and more laws are passed treating juveniles as adults that are unreformable. For example, just this month California voters approved a law enabling prosecutors to try children as young as 14 as adults. *See* Dan Morain & Tom Gorman, *Campaign 2000 Propositions,* L.A. Times, Mar. 8, 2000, at A1. California is one of only a large number of states to follow this path. *See, e.g.,* William T. Stetzer, *The Worst of Both Worlds: How the Kansas Sentencing Guidelines Have Abandoned Juveniles in the Name of "Justice,"* 35 Washburn L.J. 308, 313 n. 31 (1996) (discussing "get tough" approaches to juveniles in Connecticut, Kansas, Missouri, and Texas); *see also Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct.

2969, 106 L.Ed.2d 306 (1989) (holding constitutional death penalty for 16–year olds). It is not surprising that as public opinion swung against the idea of rehabilitation, this reaction would also impact the juvenile justice system, which was particularly designed for rehabilitation.

While the defendant in this matter is not a juvenile, she was only 21 when the crime was committed. Her youth was apparent to the court. She would historically have been viewed as someone who could be reformed, particularly because the crime was her first offense. Conditions in prisons today seem ill-suited to the task of rehabilitating her while she is incarcerated.

### a. Modern Prison Environment

Just as the intellectual critique of prisons as institutions of rehabilitation was growing, the argument was strengthened by the ill-suitedness of many modern American prisons to rehabilitate. Instead of reforming its inmates, too often a prison converts them into "hardened enem[ies] of society." H.L.A. Hart, *Punishment and Responsibility* 25–27 (1968). Not only do American prisons today contain on a pro rata basis more prisoners than any other industrialized nation, *see* James Lynch, *Crime in · International Perspective, in Crime* 32–36 (James Q. Wilson & Joan Petersilia eds.1995), the conditions of the prisons are "often undisciplined, dangerous, and degrading." Charles Fried, *Reflections on Crime and Punishment,* 30 Suffolk U.L.Rev. 681, 692 (1997).

This atmosphere makes debilitation much more · likely than rehabilitation. Whether by introducing petty criminals to more violent offenders, forcing prisoners into racist gangs, or subjecting them to violence and rape, too often the prison system serves merely to exacerbate the criminal tendencies of its inhabitants. *See, e.g., Young v. Quinlan* 960 F.2d 351, 353 (3d Cir.1992); *McGill v. Duckworth,* 944 F.2d 344, 346 (7th Cir.1991); *Ruiz v. Johnson,* 37 F.Supp.2d 855, 915–26 (S.D.Tex.

1999) (describing conditions in Texas prisons); James Gilligan, *Violence: Our Deadly Epidemic and Its Causes* 168–69 (1996); Daniel Lockwood, *Prison Sexual Violence* 87–101 (1980); David M. Siegal, *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of* Wilson v. Seiter, 44 Stan.L.Rev. 1541, 1544–47 (1992); Michael Berryhill, *Prisoner's Dilemma: Did the Texas Penal System Kill James Byrd?*, New Republic, Dec. 27, 1999, at 18. Moreover, prisons are often filled with inmates suffering from AIDS, tuberculosis, and other communicable diseases. *See, e.g.*, Richard D. Vetstein, Note, *Rape and AIDS in Prison: On a Collision Course to a New Death Penalty*, 30 Suffolk U.L.Rev. 863 (1997).

While Blake would not face the most egregious of these conditions in a federal prison, incarceration seems ill suited to facilitate rehabilitation of someone like her. Instead of being surrounded by her loving family and church, she would be placed in an atmosphere fetid with crime. Rehabilitation outside of incarceration is increasingly the only practicable way of dealing with individuals who are still ethically malleable.

### b. Current Role of Rehabilitation in Federal Sentencing

Shifts in public opinion against the rehabilitative prison model have been manifest in changing attitudes in the judiciary. *See, e.g., United States v. Bergman*, 416 F.Supp. 496, 498–99 (S.D.N.Y.1976) ("[T]his court shares the growing understanding that no one should ever be sent to prison for rehabilitation."). The legislature concurs. *See, e.g.*, Sentencing Reform Act of 1984, Pub.L. No 98–473, 98 Stat. 1987 (codified as amended in scattered sections of 18, 21 & 28 U.S.C.) (establishing Sentencing Guidelines); *see also* Tamasak Wicharaya, *Simple Theory, Hard Reality: The Impact of Sentencing Reforms on Courts, Prisons, and Crime* 28–40 (1995).

The 1984 Sentencing Reform Act was the most tangible reaction at the federal level to elimination of the prison rehabilitative model. Pre–Guidelines trial judges possessed vast discretion in sentencing defendants. The United States Parole Commission could shorten prison terms after deciding when an offender was sufficiently rehabilitated to be released. *See* 18 U.S.C. § 4206 (repealed). The Senate Report to the 1984 Act described this system as "based largely on an outmoded rehabilitation model." S.Rep. No. 98–225, at 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221.

In its place Congress established a system in which the trial judges' discretion in sentencing was reduced—although not entirely eliminated. *See Koon v. United States*, 518 U.S. 81, 97, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (explaining that in promulgating the Guidelines Congress had "manifest[ed] an intent that district courts retain much of their traditional sentencing discretion"). Parole was abolished. In seeking to truncate the rehabilitative model, Congress instructed that "[t]he [Sentencing] Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." 28 U.S.C. § 994(k).

Based on this provision, some have contended that rehabilitation is no longer a factor in federal sentencing. *See United States v. Dunnigan*, 507 U.S. 87, 98, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); Sharon M. Bunzel, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 951 (1995). This view is incorrect. Rehabilitation remains a fundamental consideration at sentencing. While the rehabilitative goals are now explicitly focused upon educational and vocational training, these and other relevant factors remain within the purview of the federal sentencing courts. *See, e.g.*, 18 U.S.C. § 3553(a)(2)(D) (listing factors court is to

consider prior to sentencing including that it "provide[s] the defendant with the needed educational or vocational training . . . or other correctional treatment in the most effective manner."); *id.* § 3562 (probation); *id.* § 3563 (conditions of probation); Comprehensive Crime Control Act of 1984, Sen.R. No. 98–225, at 67 (1983), *reprinted in* 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3250 (Title 18, Section 3553(a)(2) of the United States Code as created by the Comprehensive Crime Control Act "set forth the basic purposes at sentencing—deterrence, incapacitation, just punishment, and *rehabilitation*" (emphasis added)); *United States v. Flowers,* 983 F.Supp. 159, 165–66 (E.D.N.Y.1997); *see also United States v. Williams,* 65 F.3d 301, 306 (2d Cir.1995) (affirming facilitation of rehabilitation as basis for downward departure); Kenneth R. Feinberg, *The Federal Guidelines as the Underlying Purposes of Sentencing,* 3 Fed.Sent.Rep. 326 (May/June 1991) ("In the Sentencing Reform Act Congress spelled out the four traditional justifications of the criminal sentence—deterrence, incapacitation, retribution and rehabilitation—and expressly instructed the sentencing court to keep these purposes in mind . . . .").

While on one hand the Guidelines "reject[ ] imprisonment as a means of promoting rehabilitation, 28 U.S.C. § 994(k)," on the other hand they state "that punishment should serve retributive, *educational,* deterrent, and incapacitative goals, 18 U.S.C. § 3553(a)(2)." *United States v. Mistretta,* 488 U.S. 361, 367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (emphasis added). At the same time that they disown rehabilitation, the Guidelines urge that prisons operate to educate prisoners, one of the chief instruments of rehabilitation for more than two centuries.

In carrying out the continuing design to reform where practicable, a sentencing court can consider not only the ability of prison or probation to facilitate a defendant's future rehabilitation but also any pre-sentence rehabilitation that a defen-

dant has demonstrated. *See United States v. Core,* 125 F.3d 74, 74–75 (2d Cir.1997); *United States v. Workman,* 80 F.3d 688, 701–02 (2d Cir.1996); *United States v. Maier,* 975 F.2d 944, 948 (2d Cir.1992); *see also* Savalle C. Sims, *Should Post–Arrest Drug Rehabilitation Be a Consideration in Granting a Downward Departure under the United States Sentencing Guidelines?,* 20 J.Legis. 271 (1994); *cf.* Patricia H. Brown, *Considering Post–Arrest Rehabilitation of Addicted Offenders Under the Federal Sentencing Guidelines,* 10 Yale L. & Pol'y Rev. 520 (1992). A departure on the basis of rehabilitation requires the court to examine whether a defendant has taken responsibility for his or her actions and acted to reintegrate oneself into a productive society.

It is these considerations that are of the utmost importance in the instant case. As discussed above, Blake has already taken responsibility for her tragic actions and attempted to become a productive member of society. There is no doubt that returning Blake to prison would reverse the progress that she has made. While this danger of regression is not dispositive in the sentencing decision, it is an important factor in determining the most appropriate sentence.

4. Rehabilitation and Incarceration: Concluding Thoughts

It has become increasingly clear that utilization of non-incarcerative sentences needs to be increased. Due in part to harsher sentences required by increased statutory penalties, harsh guidelines, and mandatory minimum sentences, the federal population of prisons has multiplied exponentially in the past few decades. *See, e.g.,* Franklin E. Zimring & Gordon Hawkins, *Lethal Violence and the Overreach of American Imprisonment, in Two Views on Imprisonment Policies* 1, 3 (National Inst. of Justice, United States Dep't of Justice 1997). The total United States prison population is now some two million; when added to those in jails and on bail,

parole, probation, and supervised release, the total of "non-free" defendants must be in the order of three million. Ex-offenders subject to the stigma of incarceration must involve millions more. A permanent underclass is being created with the greatest havoc and destruction, particularly in the minority African–American and Latino communities.

Prison conditions encouraging rehabilitation have deteriorated as educational and drug programs, space per prisoner, and library and other facilities have decreased relative to the number of prisoners. In addition, state and federal laws have reduced opportunities for higher education of prisons and their access to libraries and the courts. Increased numbers of prisoners with AIDS, tuberculosis, and other diseases add to the risks prisoners face, as does the threat of sexual attacks and racially controlled gang and individual violence. Somewhat ironically, this trend has occurred at the same time as the nation has made enormous expenditures for new prisons, not to improve them but simply to handle the growing population.

This is not the environment that a young, vulnerable female should be placed in unless absolutely necessary as because she is such a crime-hardened recidivist that incapacitation is required. By contrast, strict controls outside of prison can be more beneficial not only for her rehabilitation but also for society. While on supervised release, the ties of community and family can help integrate the defendant into a healthy respect for the law and an understanding of the responsibilities of adulthood (and in this case motherhood). This knowledge enhances the probability of a law-abiding life, of contributions to society in the form of taxes and otherwise, and of a substantial reduction in the cost to taxpayers whose expenditures for incarceration are many times larger than for strict supervised release.

The difficulty of rehabilitation in prison and the high costs it involves require the court in a case such as this one to consider the possibility of a non-custodial sentence. *Cf.* ABA Standards for Criminal Justice Sentencing, Standard 18–6.4(a) (3d ed. 1994) ("A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary."); *id.* Standard 18–6.2(a) ("A sentencing court should consider all permitted types of sanctions . . . .").

B. Victim Impact

■ Victim impact statements and the sentencing desires of victims perform an important function in our modern criminal justice system. While a victim's reactions are not controlling, they are something that a judge must and should consider before imposing sentence. These statements serve three valuable purposes. First, they provide details about the seriousness of the crime. Second, they provide some indication of what punishment society deems appropriate. Finally, they allow victims to realize that they are important participants in the criminal justice process, thus preventing them from losing faith in the system and possibly turning to the dangerous course of self-help. Although the actual use of victim impact statements is somewhat recent, the role they play in the sentencing process has a long pedigree.

1. Historical Uses of Victim Impact Considerations

Ever since the colonial period in this country, as well as in England, a sentencing judge "could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). As Justice Black explained, the role of the sentencing judge requires "the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 247, 69 S.Ct. 1079; *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the in-

formation concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

At the time of *Williams,* victim impact evidence was almost unheard of. *See Payne v. Tennessee,* 501 U.S. 808, 857, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (Stevens, J., dissenting); *see also id.* at 821, 111 S.Ct. 2597 (opinion of the court) (stating that victim impact evidence "is of recent origin"). Such evidence was still not generally accepted as late as the 1970s. *See id.* at 858, 111 S.Ct. 2597 (Stevens, J., dissenting). By that time, a victim rights movement had developed, which sought to give victims a formal role in the criminal judicial process. *See* Richard L. Aynes, *Constitutional Considerations: Government Responsibility and the Right Not to be a Victim,* 11 Pepp.L.Rev. 63, 65 n. 2 (1984) (discussing origin of victim's rights movement as arising out of women's rights groups efforts to protect rape victims); Ellen Yaroshefsky, *Balancing Victim's Rights and Vigorous Advocacy for the Defendant,* 1989 Ann.Surv.Am.L. 135, 141 (1990) (same).

Over the past two decades Congress has passed legislation granting victims an expanded role in sentencings. In 1982, the Victim and Witness Protection Act, Pub.L. 97–291, 96 Stat. 1248 (codified at 18 U.S.C. §§ 1512–1515, 3663–3664), was enacted. It requires district courts to consider victim impact information as part of the presentence report. *See United States v. Dominguez,* 951 F.2d 412, 417 (1st Cir. 1991) (Breyer, C.J.).

Twelve years later, amendments were added to the Federal Rules of Criminal Procedure requiring that the sentencing court "determine if the victim wishes to make a statement or present any information in relation to the sentence" if the crime is one of violence or sexual abuse. Fed.R.Crim.P. 32(c)(3)(E); *see* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat.2078, at § 230101; *United States v. Smith,* 893 F.Supp. 187, 188 (E.D.N.Y.1995). Since that time, members of Congress have introduced several versions of constitutional amendments seeking to guarantee the rights of victims to be present and heard in criminal proceedings. *See, e.g.,* S.J.Res. 6, 105th Cong. (1997); H.R.1322, 105th Cong. (1997); S.J.Res.Res. 52, 104th Cong. (1996); H.R.J.Res. 173, 104th Cong. (1996).

These developments were not without controversy, particularly when the death penalty was at issue. Beginning in 1987, the Supreme Court addressed the use of victim impact statements in three cases. In first two, the Court barred the use at sentencing hearings of victim impact evidence relating to the personal characteristics of the victim and the impact of the crime on the victim's family in capital cases. *See South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989) (finding unconstitutional use of prosecutorial statements to the sentencing jury about personal qualities of victim); *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (holding unconstitutional use of victim impact statements). In 1991 the Court reversed course, finding that the admission of such evidence at capital sentencings did not violate the Eighth and Fourteenth Amendments. *See Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

The Court in *Booth* had also precluded the admission of a victim's family members' opinions regarding the crime, the defendant, and the appropriate sentence. The *Payne* Court did not address this issue. *See Payne,* 501 U.S. at 830 n. 2, 111 S.Ct. 2597. A similar type of evidence has, however, been presented in the instant case. Ms. Nauzo has not only used her statements to describe the crime and her continued suffering but also to state her opinion on the appropriate sentence.

The situation in this case is markedly different from those in the cases the Supreme Court examined. First, this is not a capital case. As the Supreme Court has reminded us numerous times, death is different. *See, e.g., Turner v. Murray,* 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *id.* at 117, 102 S.Ct. 869 (O'Connor, J., concurring); *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion); *see also Schiro v. Farley,* 510 U.S. 222, 237, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (Blackmun, J., dissenting). Second, Ms. Nauzo's statement was made not to a jury but to a sentencing judge. Accordingly, the likelihood of improper prejudice overly influencing the sentencing decision is reduced.

Third, the statement is not from the victim's friends or family, as it must be in a murder case, but here it is from the person most affected by the crime. Most importantly, this information about what Ms. Nauzo considers the appropriate sentence is important in furthering at least some of the goals that victim impact statements seek to achieve.

### 2. Role of Victim Impact in the Current Federal Regime

Sentencing courts are required to listen to statements from victims. The statute authorizing the Sentencing Guidelines requires judges to consider "the need for the sentence imposed ... to reflect the seriousness of the offense [and] to promote respect for the law." 18 U.S.C. § 3553(a)(2). Victim impact statements better enable the court to fulfill these goals.

### a. Seriousness of Offense

Victim impact statements provide tangible evidence of how much harm a victim suffered. Such information, whether provided via the victim or through other means, has always played a role in the punishment that has been meted out. This is seen, for example, in the higher sentences given to those who murder their victims than those who try to kill them but fail. In countless cases, our current sentencing regime looks to the harm suffered as one factor to consider in determining the sentence. *See, e.g.,* U.S.S.G. § 2A2.2(b)(3) (increased offense level for aggravated assault depending on seriousness of injury); § 2B1.1(b) (increased offense level for larceny, embezzlement, etc. if pecuniary loss was greater); § 2F1.1 (increased offense level for fraud if loss was greater).

Even in death penalty jurisprudence, the harm suffered plays a critical role in determining when this penalty is constitutional. The Supreme Court has held that it is only when death results and a defendant has the requisite mens rea that capital punishment can pass constitutional muster. *See Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (Eighth Amendment prohibits imposition of death penalty on a defendant "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed"); *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death penalty for rape violates the Eighth Amendment); *see also Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (death penalty is constitutional if a defendant engaged in "major participation in the felony committed, combined with reckless indifference to human life"); *cf. Payne,* 501 U.S. at 819–20, 111 S.Ct. 2597 (discussing number of capital crimes in 18th century in England and Europe); 2 Blackstone, Commentaries on the Laws of England 1756–1757 (Lewis Ed.1897); Ved P. Nanda, *Recent Developments in the United States and Internationally Regarding Capital Punishment—An Appraisal,* St. John's L.Rev. 67, 523, 545–46 (1993).

The idea of proportionality in sentencing, i.e., that "the punishment should fit the crime," is as old as the axiom "an eye for an eye and a tooth for a tooth." Exodus 21:22–23. This idea was also a focal point of Beccaria who stated that "the true measure of crimes is the injury done to society," James Anson Farrer, Crimes and Punishments 199 (1880) (quoting Beccaria). A more enlightened vision of proportionality and reliability led to a large reduction in the number of crimes punishable by death and the grading of crimes based on their severity. *See supra* Subpart IV.A.2; *see also* Taylor Young Hong, *Televised Executions and Restoring Accountability to the Death Penalty Debate*, 29 Colum.Hum.Rts.L.Rev. 787, 799 n. 64 (1998) (reviewing John D. Bessler, *Death in the Dark: Midnight Executions in America* (1997)); Panel Discussion, *Human Rights and Human Wrongs: Is the United States Death Penalty System Inconsistent with International Human Rights Law?*, 67 Fordham L.Rev. 2793, 2793 (1999) (comments of Dorean Marguerite Koenig).

Harm has a dual significance in Anglo–American jurisprudence: first, "as a prerequisite to the criminal sanction" and second "as a measure of the seriousness of the offense and therefore as a standard for determining the severity of the sentence that will be meted out." Stanton K. Wheeler et al., *Sitting in Judgment: The Sentencing of White–Collar Criminals* 56 (1988). The victim is uniquely placed to describe the harm suffered. As long as the victim is still alive, he or she can describe the physical or pecuniary damage that has occurred, enabling the sentencing court to better understand the impact of the crime. In the instant case, Ms. Nauzo's letters have provided the court with a vivid description of the ramifications of the crime.

### b. Respect for Law

Understanding what sentence the victim deems appropriate helps further respect for the law in two ways. First, it enables the court to have an idea of what someone in society who has been forced to confront the issue deems a just punishment. Second, it allows the victim to realize that she is more than a mere spectator in the criminal justice process.

### i. Societal Desires

In order to engender respect for the law, it is necessary for the sentencing court to weigh the impact a sentence will have on those affected. This process goes beyond a mere desire for retribution. It is related to the "utilitarian theories of punishment [which] have dominated American jurisprudence during most of the twentieth century." Kent Greenawalt, *Punishment*, 74 J.Crim.L. & Criminology 343, 350 (1983). As Professor Greenawalt notes, utilitarian theories have many beneficial consequences such as general deterrence, specific deterrence, incapacitation, and rehabilitation, as well as several less-commonly mentioned goals, such as what Professor Greenawalt labels "norm reinforcement." *Id.* at 351; *cf.* 18 U.S.C. § 3553. This last term refers to a "person's feeling of moral obligation to obey rules [that] may depend considerably on his sense that he is treated fairly under them." Greenawalt, *supra*, at 351. When individuals feel that the rule of law is subverted for others, they are more likely to break the law themselves.

In addition, Professor Greenawalt points out the beneficial effect of "vengeance." *Id.* at 352. Here, he does not necessarily refer to some cruel desire that the criminal suffer, but that "victims, their families and friends, and some members of the public will feel frustrated if [a harsh] response [to the defendant] is not forthcoming." *Id.*

Victims attitudes towards the criminal are not uniform. Surveys indicate that while some are certainly vindictive and disappointed when a relatively mild sentence is imposed, others are more sympathetic to the criminal and do not seek the maximum possible penalty. *See* Donald J. Hall, *Victims' Voices in Criminal Court:*

*The Need for Restraint,* 28 Am.Crim. J.Rev. 233, 243–46 (1991) (discussing several victim surveys with disparate results).

When victim frustration becomes too great, faith in the criminal justice system may be seriously reduced. Victims, their families, and others may resort to self-help remedies leading in the most extreme cases to a breakdown in the rule of law and vigilantism.

Loss of faith and reliance on exterior means of justice was powerfully demonstrated in the opening scene of the classic film *The Godfather.* The movie opens with Bonasera, the undertaker, asking the Godfather, Don Vito Corleone, to properly punish the two men who had beaten his daughter and then received only suspended sentences. He has concluded that it is only through extra-legal means that he can achieve justice:

> I went to the police, like a good American. These two boys were brought to trial. The judge sentenced them to three years in prison—suspended sentence.
>
> Suspended sentence! They went free that very day!
>
> I stood in the courtroom like a fool. And those two bastard, they smiled at me. Then I said to my wife, "for justice, we must go to Don Corleone."

*The Godfather* (Paramount 1972).

While somewhat farfetched, the film does touch a core of society's concerns. Respect for law is but a brittle shield against the self-help that is incompatible with a system of effective justice. By hearing the victim and understanding his or her suffering, the criminal justice system acts to reduce this possibility.

### ii. Victim Catharsis

Victim impact statements may also serve as a catharsis for victims, helping to assuage the bitterness at the fates that they have suffered. By participating in the criminal proceeding, victims realize that they are recognized as important by the court. The proceeding is not merely about the criminal, but it also accounts for the person most affected by the crime. Simply giving this person a chance to speak and be heard can have a beneficial effect. Instead of the victim feeling depersonalized and forgotten by the legal processes, she can feel that her situation was properly understood and considered.

Ms. Nauzo has felt some of these benefits through her participation. Her powerful initial letter describing the agony she has gone through for the past year brought to light the full extent of the victim's actions. Her second letter shows the benefits of the process in reducing bitterness. Her sentiments have weighed heavily on the court in attempting to reach a decision.

### 3. Restitution

Modern federal law also requires consideration of the victim through the availability of restitution. Restitution not only requires the court to directly examine the harm that a victim has suffered, but it also attempts to make the victim whole. While in many cases—and this is one—money could never fully restore a victim to the status quo ante, restitution at least seeks to repair some of the damage suffered.

Section 3663(a)(1) of the United States Code provides that "[t]he court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or ... in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense." *See, e.g.,* U.S.S.G. § 5E1.1; *United States v. Cheung,* 952 F.Supp. 148 (E.D.N.Y.1997); *United States v. Ferranti,* 928 F.Supp. 206, 220–23 (E.D.N.Y.1996), *aff'd,* 135 F.3d 116 (2d Cir.), *cert. denied,* 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998). The statute require a balancing of the need to compensate the victim and the need to prevent so burdening the defendant and his or her family that it will suffer unduly:

The court, in determining whether to order restitution under this section, shall consider—

(I) the amount of the loss sustained by each victim as a result of the offense; and

(II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3663(B)(i). Among those "other factors" that a court should consider is that the amount of restitution should not present such a continuing burden on the defendant as to make rehabilitation almost impossible.

In this case, great tension exists between the enumerated restitution factors. Ms. Nauzo has clearly suffered great injury. At the same time, defendant possesses limited resources and is highly unlikely to amass sizable wealth in the future. Moreover, she is raising a three year old daughter. While some restitution is clearly warranted, the court must set a level that will not unduly punish defendant and her daughter.

### C. Reconciliation and Forgiveness

A number of observers have pointed out that for atonement for a crime to occur, steps must be taken by both perpetrator and victim. *See, e.g.,* Richard Swinburne, *Responsibility and Atonement* 81 (1989); Stephen P. Garvey, *Punishment as Atonement,* 46 UCLA L.Rev. 1801, 1804 (1999). While atonement may not be the goal of the American criminal justice system, it does provide a window to a secular moral perspective.

Crime has long been viewed as creating a breach between the criminal and society. The roots of this idea go back to biblical times which viewed the breach as occurring between the sinner and God. This theory holds that atonement is attained through suffering and sacrifice. *See, e.g.,*

Leviticus 16:1–34; St. Anselm, *Cur Deus Homo, in Saint Anselm: Basic Writings* 171 (S.N. Deane trans., 2d ed.1962) (1098); Garvey, *supra,* at 1809–10. While the court's view must be based on secular considerations, this religious approach is reflected in the nation's morality. *See* Garvey, *supra,* at 1802–03, 1807.

Swinburne and Garvey have argued that atonement requires repentance, apology, reparation, and penance by the criminal and also forgiveness by the victim. *See* Swinburne, *supra,* at 81; Garvey, *supra,* at 1804; *see also* James Griffin, *Well–Being: Its Meaning, Measurement, and Moral Importance* 272 (1986) ("The appropriate response to wrongdoing is: perception of wrongdoing, guilt, and repentance.").

Blake has repented by recognizing her guilt. She is remorseful over what she has done. She has also sought to apologize for her crime both to society at large and to Ms. Nauzo in particular, and she has offered reparations for Ms. Nauzo's injuries. This reflection and introspection is an aspect of her rehabilitation.

Ms. Nauzo understandably has not fully forgiven Blake. Professor Garvey defines forgiveness not as mercy, pardon, condonation, or forgetting on the part of a victim but as "the overcoming or foreswearing of resentment, or at least an attempt to overcome it." Garvey, *supra,* at 1827–28. Ms. Nauzo's second letter indicates she has developed some understanding of Blake and her tragic actions. Incarcerating Blake would not further repair the breach between victim and criminal but would harm chances for rehabilitation.

### V. CONCLUSION

In the end, the sentencing judge must perform a delicate balancing that involves weighing several factors: the need to protect the public through general deterrence and incapacitation; a punishment to ensure that the defendant receives just desserts while offered a chance for rehabilitation; appropriate restitution to satisfy the victim and create a sense that

justice has been done; and a need to preserve the impression that the rule of law has been followed. Here the complex synthesis is made as follows:

Because of the aberrant nature of this crime, the diminished capacity she was under at the time of the offense, the effect on family, and the extensive rehabilitation demonstrated by Blake, the court departs to the appropriate Guideline offense level of 8. Pursuant to that departure, Blake is sentenced to time served plus five years of strictly supervised release and a $100 special assessment.

In addition, Blake is ordered to pay restitution to Sheron Nauzo in the amount of $5,000; while only a token, this is all that defendant can reasonably be expected to afford. Payment is to be made in monthly increments of $80 with the full amount to be paid within five years; no interest is to be assessed.

She also must remain in therapy for the duration of her supervised release term unless directed otherwise by probation. She is prohibited from using or possessing narcotics or firearms. She must conform to all orders of Probation Service. Failure to follow all the terms of supervised release may result in a long prison term.

SO ORDERED.